WILLIAM L. G. PHETTEPLACE *et al. vs.* BRITISH & FOREIGN MARINE INSURANCE CO.

PROVIDENCE—MAY 17, 1901.

PRESENT : Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Marine Insurance. Policy. Evidence.*

Where from the face of a marine insurance policy it is doubtful whether the intent of the parties was that the policy should protect against loss by leakage from whatever cause arising, or against marine risks only, parol evidence is admissible to show the intent of the parties and what construction they themselves had put upon it.

(2) *Marine Insurance.*

A marine insurance policy covered all shipments of oil from ports in the Mediterranean Sea to New York, Philadelphia, or Boston, direct or via port or ports and at and thence to Providence, with privilege of transshipment, including risk of craft to and from the ship or vessel, each craft to be considered a separate risk ; covered leakage amounting to five per cent. on each barrel over ordinary leakage, which was agreed to be two per cent. ; not liable for particular average, nor for breakage of merchandise unless occasioned by stranding or collision with another vessel ; the perils which the insurance company took upon itself were of

the seas, fires, pirates, and all other perils, losses or misfortunes that should come to the hurt or damage of the goods :—

*Held,* that overland transit to Providence of oils shipped from Mediterranean ports to Boston or Philadelphia was authorized under the above contract, the water route being greater and more dangerous and comparatively uncommon, all of which must have been known to the company; hence the company was liable for leakage under the policy, although it could not be shown where the leakage took place.

(3) *Marine Insurance.*

Where an insurance company has paid a number of losses under a policy upon proofs similar to the one in the case at bar, it cannot, without any notice until the trial that it would no longer pay upon such proofs, refuse to pay further.

(4) *Marine Insurance.*

Under the above policy the company is not liable for leakage unless the leakage on each barrel has amounted to seven per cent. or upwards ; and when it becomes liable at all, it is liable for the whole leakage on each barrel, without deducting either seven per cent. or two per cent.

Assumpsit on a policy of insurance. The facts are fully stated in the opinion. Heard on petition of defendant for new trial, and new trial denied.

Per Curiam. The defendant's petition for a new trial is denied, and judgment will be entered upon the decision of Mr. Justice Rogers, for the reasons assigned by him in said decision, which is adopted as the opinion of the court.

## Decision.

Rogers, J. The plaintiffs, who are copartners under the firm name of the Phetteplace Olive Oil Importing Company, bring this action to recover for loss by leakage on several cargoes of oil shipped from Marseilles and other Mediterranean ports to them, at Providence, R. I.

I find the facts to be that the plaintiffs obtained insurance from the defendant through the latter's agents in Providence, Starkweather & Shepley, by policy dated December 28, 1893, which was in form an ordinary marine policy with some additions written in ; that said policy, after giving the name of the defendant company, continued in this wise (the

written words of the quotation being italicized, while the printed words are not), viz.: "*Phetteplace Olive Oil Co.* on account of *whom it may concern. To cover all shipments of olive oil consigned to them direct, or to order, or to Bankers, if designed for the control of the assured.* In case of loss to be paid in funds current in the United States to *Brown Brothers & Co., or as interest may appear.* Do make insurance and cause to be insured, lost or not lost, at and from *port or ports in the Mediterranean Sea to New York* $\frac{and}{or}$ *Philadelphia* $\frac{and}{or}$ *Boston, direct, or via port or ports and at and thence to Providence* $\frac{and}{or}$ *Boston* $\frac{and}{or}$ *Philadelphia, with privilege of transhipment* (including risk of craft to and from the ship or vessel, each craft to be considered a separate risk) *on olive oil ; to cover leakage amounting to five per cent. on each barrel over ordinary leakage, which is agreed to be two per cent. It is understood and agreed that any claims under the leakage clause are not payable to Brown Brothers, but direct to the assured,* upon all kinds of lawful goods and merchandise, laden or to be laden, on board the good *steamer or steamers*,    whereof    is master," &c.; that said policy was continuous until discontinued, and either party could discontinue on giving thirty days' written notice to the other party ; that the premium named in the policy, by indorsement on the back, was eighty cents per hundred dollars insured, but it nowhere appeared on the policy whether this was an extraordinary or increased premium over and above what was ordinarily charged for marine insurance, and the policy provided that premiums were payable monthly in advance; that among the numerous printed provisions contained in the policy there was, under the title Memorandum, the following : "Not liable for particular average on molasses or other liquids, nor for breakage of merchandise unless occasioned by stranding or collision with another vessel ;" that one of the printed provisions in said policy was the following, viz.: "Touching the adventures and perils which the said insurance company is contented to bear, and takes upon itself in this voyage, they are of the seas, fires,

pirates, . . . and all the other perils, losses, or misfortunes that have or shall come to the hurt, detriment, or damage of the said goods or merchandise or any part thereof ; " that several cargoes of olive oil, covered by said policy, were shipped from Marseilles and Naples, on the Mediterranean Sea, to the plaintiffs, on which the leakage amounted to more than seven per cent. ; that all of said oil was shipped by steamer to New York, Philadelphia, or Boston ; that some of said oil was forwarded from said American ports to Providence by rail, but how much thereof was so forwarded by rail did not appear in evidence ; that said oil was shipped in good order at the Mediterranean ports, and that when it arrived in Providence examination showed that more than seven per cent. had leaked out, but where or on what part of the trip, or whether on sea or land, such leakage occurred the proof did not show, neither did it show that the leakage was occasioned by stranding or collision with another vessel, or how it was occasioned ; that one of the printed clauses of the policy was as follows, viz. : "Proofs of loss and all bills of expenses must be approved by the agents of the company, if there be one, at or near the place where the loss occurs or the expenses are incurred, or if there be none in the vicinity, by the correspondent of the National Board of Marine Underwriters ; and such agent or correspondent must be represented on all surveys ;" that when a cargo arrived here, and there was a leakage, the plaintiffs would notify defendant's agents here that there was such a loss, and ask them to send an inspector, if they desired, and then the plaintiffs personally weighed the leaking packages and deducted the weight from the real weight, as shown by the invoice by which the plaintiffs had bought, the balance being the amount of loss, and being computed at the price of the oil at the point of shipment ; that that was the only proof of loss furnished, that said defendant's agents made no objection thereto, but paid several losses arising from leakage under this policy upon the statements as made up by the plaintiffs ; that parol evidence was offered by the plaintiffs against the objection of the defendant, which was admitted *de bene,* as

to the conversations between the plaintiffs and the defendant's agents, of the nature of the insurance desired at the time of taking out the policy, also, that the rate of premium charged was a largely increased rate over the ordinary rate ; that the defendant paid several losses under this policy, that expert evidence was admitted, showing that this form of leakage clause was qualified insurance, and that it was customary in the trade for insurance companies to pay such leakage.

(1)  The questions in this case all arise in regard to leakage, and the construction of the policy relating thereto, is, therefore, all-important.   Leakage of liquids, especially on a long voyage, may result from various causes.   It may result from strictly maritime causes, as from stranding, collision, &c. ; or it may result, without any injury to the ship or cargo, from strictly maritime causes, as by rough weather causing the ship to pitch and roll, thereby causing the barrels or cases containing the liquid to leak ; or it may result from the proper vice of the subject-matter : so that *ordinary* leakage has become a well-known term.   It is impossible, in very many cases, to determine just the cause of leakage, but it is a substantial loss, the risk of which some shippers do not care to assume, and so seek protection from insurance companies, not only for leakage arising from known strictly maritime causes, but also from any cause (except, of course, from the misconduct of the assured).

Relying on the language of the policy merely, the reading of it would incline the court to the opinion that it was not alone a policy against marine risks, but it was also a policy against loss by leakage from whatever cause arising, provided the leakage amounted to seven per cent.   The defendant contends that this was a marine policy only, and that it can be treated only as a marine policy.   There is nothing in law to prevent this being treated as covering other losses than those arising from marine perils, if the insurers have so agreed.   Emerigon says, in the English translation of his work on Insurance, at page 312 :   "Though the loss, says the ordonnance, which happens through the proper vice

of the subject is not a maritime risk properly called, still nothing prevents the insurers from rendering themselves responsible by a special agreement."

At the trial the defendant's counsel contended that the language of the policy was so clear, so free from ambiguity, that no doubt could arise as to this policy being against sea perils alone, and objected to parol evidence being admitted. The court admitted such evidence *de bene*, as throwing light upon the intent of the parties, and now formally rules in such evidence as admissible.

Poland, J., in *Lowry et al.* v. *Adams*, 22 Vt. 160, 165, says: " For the purpose of ascertaining the intent of the parties in entering into any contract, courts will look at the situation of the parties making it, the subject-matter of the contract, the motives of the parties in entering into it, and the object to be attained by it; and even in cases where the contract is reduced to writing, will allow all these circumstances to be shown by *parol* evidence, if the intent of the parties upon the face of the contract is doubtful, or the language used by them will admit of more than one interpretation.   .   .   . When, from the contract itself and all the surrounding circumstances, the true object and intent of the parties has been ascertained, courts will enforce the contract according to that intent, unless there be found in the way some stubborn, inflexible rule of law, absolutely requiring a different determination."   See also *Shore* v. *Wilson*, 9 C. & F. 355, 366; *Nash* v. *Towne*, 5 Wall. 689; *McDonald* v. *Longbottom*, 1 Ellis & Ellis, 977; *Goodrich* v. *Stevens*, 5 Lans. 230; *Donlin* v. *Deagling*, 80 Ill. 608; *Buckmaster* v. *Jacobs*, 27 La. An. 626.

The evidence shows clearly that the intention of the parties was to insure against leakage, if amounting to seven per cent., from whatever cause arising (except, of course, the misconduct of the insured), and that an increased premium was to be, and was, paid therefor; and, hence, it was not necessary for the plaintiffs to show that the leakage was occasioned by stranding or collision with another vessel.

The defendant contends that some of the oil in controversy

was conveyed from some of the American ports, where it was landed, to Providence, by rail, and that, inasmuch as it is not known where the leakage took place, it may not have been on a vessel at all; and that, hence, it could not have been intended to be covered by this policy, unless shown to have been suffered on shipboard.

That depends, however, altogether upon the contract and understanding between the parties, and the course of business. The distance between Naples and New York, Philadelphia, or Boston is between 3,000 and 4,000 miles, and between Marseilles and New York, Philadelphia, or Boston is but a few hundred miles less, and must necessarily be accomplished by water, while the distance from Boston to Providence by land is but forty-three miles, the distance by water being several times as far, and over dangerous waters, there being no regular water line between the two places; so, also, the distance from Philadelphia to Providence is but a small percentage of the distance from Naples or Marseilles to Providence, and that water carriage between Philadelphia and Providence was comparatively uncommon, and all this must have been known to the defendant. The case at bar, so far as the overland transit is concerned, seems to me to be analogous to the case of *Rodocanachi et al.* v. *Elliott*, L. R. 8 C. P. 649, in this, that, in that case, as well as in this case, upon a marine policy, some overland transit was authorized.

Parol evidence—as to how the parties had treated this policy, and the risk covered by it, in other words what construction the parties themselves had put upon it—was offered by the plaintiffs, and was admitted *de bene;* and as to such testimony, as well as to the other parol evidence offered at the trial, the court now rules it to have been admissible.

In *Davis* v. *Shafer*, 50 Fed. Rep. 764, 768, Phillips, J., says: "Where the contract in question employs words or terms of doubtful or ambiguous meaning and application, the meaning and application given them by the parties to the contract, and acted on by them, should prevail over any technical, grammatical, or logical interpretation of the words and phrases. But where the contract is free from ambiguity, and

'its meaning is clear in the eye of the law,' such evidence is clearly incompetent." See also *R. R. Co.* v. *Trimble*, 10 Wall. 367 ; *Michael* v. *St. L. M. F. Ins. Co.*, 17 Mo. Ap. 23, 26 ; *St. Paul, &c., R. R. Co.* v. *Blackmar*, 44 Minn. 514, 518.

(3)   It is in evidence, in this case, that the defendant has paid losses for leakage under the policy under consideration upon like proofs, and made up in the same manner, as were the proofs as to the losses it now refuses to pay.

The defendant, having paid a number of losses under this policy, cannot now, in my opinion, without any notice, until upon the trial, that the procedure it had previously followed was unsatisfactory, refuse to pay further.

(4)   As to the amount of damage, it seems to me that the defendant is not liable to pay for leakage unless the leakage on each barrel on which leakage is claimed has amounted to seven per cent. or upwards ; and when it becomes liable at all, then it becomes liable for the whole leakage on such barrel, without deducting either seven per cent. or two per cent. The policy reads : "To cover leakage amounting to five per cent. on each barrel over ordinary leakage, which it is agreed to be two per cent." The policy does not say that ordinary leakage was to be first deducted and only the extraordinary leakage paid for, but it seems to me to indicate that until seven per cent. leakage, or three and one-half times as much as ordinary leakage, has taken place, the defendant shall not be liable ; but when the seven per cent. leakage has occurred, then the defendant is to be liable for the whole leakage ; otherwise it would have been very easy, as in *Indemnity M. M. Assur. Co.* v. *United Oil Co.*, 88 Fed. Rep. 315, to have stated "that one-half of one per cent. of the quantity laden shall be first deducted as ordinary leakage, the excess of such one-half of one per cent. to be considered as extraordinary leakage, loss to be paid," etc. In the case at bar two per cent., instead of one-half of one per cent., was mentioned as ordinary leakage. Both parties claim the last abovenamed case to favor their respective contentions as to the amount to be paid, and it is not entirely clear exactly what the judge intended.

In the case of *Donnell et al.* v. *Columbian Ins. Co.*, 2 Sumner, 366, involving the construction of a clause in a marine policy, that the underwriters should not be liable for any partial loss on other goods, or on the vessel and freight unless it amounts to five per cent., etc., Story, J., at page 382, says : "All the commentators upon this article agree that, when the underwriters are liable at all under this clause, they are liable for the full amount of the average without deduction." Though the foregoing relates to average and not to leakage, yet the limiting clause seems to be similar in character to the one in question.

The parties in the suit at bar have put their own construction as to the amount to be paid, by the defendant's paying and the plaintiffs' receiving the full amount of the leakage where such leakage was more than seven per cent., and that seems to me to be the proper construction.

The finding and decision of the court is that the defendant did promise in manner and form as the plaintiffs have declared against it, and damages are assessed in the sum of $1,064.24, with interest thereon from September 7, 1895, amounting to $347.75, making the sum of $1,411.99 ; for which last-mentioned sum the plaintiffs are entitled to judgment against the defendant, together with costs.